FILED

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

2018 JUL 18 PM 1:51

MIDDLE DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION; | CASE NO. _____ |
| OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS; | 6:18-cv-1153-Orl-41KRS |
| CALIFORNIA OFFICE OF THE ATTORNEY GENERAL; | |
| STATE OF MARYLAND BY THE ATTORNEY GENERAL OF MARYLAND AND THE SECRETARY OF STATE OF MARYLAND; | **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF** |
| STATE OF MINNESOTA BY ITS ATTORNEY GENERAL LORI SWANSON; | **INJUNCTIVE RELIEF SOUGHT** |
| STATE OF OHIO, ex rel. MIKE DEWINE, OHIO ATTORNEY GENERAL, CHARITABLE LAW SECTION; and | |
| STATE OF OREGON, BY ELLEN F. ROSENBLUM, OREGON ATTORNEY GENERAL, | |
| Plaintiffs, | |
| v. | |
| HELP THE VETS, INC., a Florida Corporation, also d/b/a AMERICAN DISABLED VETERANS FOUNDATION, INC., MILITARY FAMILIES OF AMERICA, VETERANS EMERGENCY BLOOD BANK, VETERANS FIGHTING BREAST CANCER, and VETS FIGHTING BREAST CANCER; and | |
| NEIL G. PAULSON, SR., individually and as an officer of HELP THE VETS, INC., | |
| Defendants. | |

Plaintiffs, the Federal Trade Commission ("FTC") and the Attorneys General of the

States of Florida, California, Maryland, Minnesota, Ohio, and Oregon for their Complaint

allege:

## SUMMARY OF THE CASE

1.      Sham charity Help the Vets, Inc., promised potential donors that their

contributions would assist wounded and disabled military veterans.  Generous Americans

responded to the call, donating more than $11 million in cash from 2014 through 2016.  The

vast majority of these funds – more than 95% – were not used to help veterans.  Instead,

donations almost entirely benefitted the founder and president of Help the Vets, Inc.,

Defendant Neil G. Paulson, Sr., and the for-profit fundraisers he hired.  Any benefit to

veterans was merely incidental.

2.      Help the Vets, Inc. ("Help the Vets"), told donors that their contributions

would be used to pay for a variety of programs to assist veterans in crisis, especially severely

wounded or disabled veterans.  Among other things, Help the Vets, both under its own name

and using a variety of assumed names, claimed to fund veterans' medical care, operate a

suicide prevention program for veterans, offer retreats for veterans recuperating from the

stress of war, and offer assistance to U.S. veterans fighting breast cancer.  These programs

were largely illusory, as were numerous other programs for which Help the Vets sought

donations.  Yet based on these promises to help veterans, Help the Vets convinced thousands

of donors to give millions of dollars for programs that simply did not help veterans as

described.

3.     While donors dug deep into their pockets in response to pleas for assistance, Help the Vets paid its president, Neil G. Paulson, Sr. ("Paulson"), hundreds of thousands of dollars and spent more than 88% of every dollar donated from 2014 through 2016 (the last year for which Help the Vets has reported financial information) paying for-profit fundraisers.  Continuing through 2017, Help the Vets misled donors about the good their charitable donations would accomplish, and prevented millions of dollars from going to legitimate charities that do help wounded and disabled veterans.

4.     The deceptive acts and practices of Paulson and Help the Vets (collectively, "Defendants") have violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45; Section 310.3(b) of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.3(b); and the laws of the States of Florida, California, Maryland, Minnesota, Ohio, and Oregon.

5.     The FTC brings this action under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the TSR, 16 C.F.R. Part 310.

6.     The Office of the Attorney General, State of Florida, Department of Legal Affairs ("Florida Attorney General"), brings this Complaint in the public interest and under the authority vested in the Florida Attorney General pursuant to the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes (the "FDUTPA"); Florida's

Solicitation of Contributions Act, Chapter 496, Florida Statutes; the Florida Not For Profit

Corporation Act, Chapter 617, Florida Statutes; the Florida Trust Code, Chapter 736, Florida

Statutes, and the Attorney General's common law authority to enforce charitable trusts.  The

aforementioned authority permits the Florida Attorney General to seek permanent injunctive

relief, including, but not limited to, carrying out a transaction in accordance with the

reasonable expectations of consumers or governmental entities, appointing a receiver,

reimbursing consumers or governmental entities found to have been damaged, ordering

corporate dissolution, ordering charitable contributions, imposing reasonable restrictions

upon the future activities of Defendants, and legal, equitable, or other appropriate relief.

§§ 501.207, 501.203(3)(c)(1), Fla. Stat. (2018); § 496.416, Fla. Stat. (2018); §§ 617.2003,

617.1420, 617.1430 Fla. Stat. (2018); Chapter 736, Fla. Stat. (2018).  Florida law also

authorizes the Florida Attorney General to obtain civil penalties and reimbursement of costs

and attorneys' fees for Defendants' acts or practices in violation of Sections 501.2075 and

501.2077, Florida Statutes.

7.      The California Office of the Attorney General brings this action under the

California Supervision of Trustees and Fundraisers for Charitable Purposes Act ("California

Supervision Act," Cal. Gov't Code § 12580 et seq.), particularly California Government

Code §§ 12591, 12591.1(f), and 12598 of the California Supervision Act, Business and

Professions Code §§ 17203, 17204, 17206, and 17206.1 of the California Unfair Competition

Law ("California UCL," Cal. Bus. & Prof. Code §§ 17200-17208), and common law

authority to obtain an injunction, restitution, restoration of money or property, civil penalties,

attorney's fees and costs, and other relief as may be appropriate to ensure the due application

of charitable funds for Defendants' acts or practices in violation of the California Supervision Act and California UCL.

8. The State of Maryland, by the Office of the Attorney General of Maryland ("Maryland Attorney General") represents the public interest in the protection of charitable assets, and brings this action pursuant to Md. Code Ann., Bus. Reg., § 6.5-102(a) to prevent, remedy, or obtain damages for the misapplication, diversion, or waste of a charitable asset or a breach of fiduciary or other legal duty in the governance, management, or administration of a charitable asset. In addition, the Secretary of State and Attorney General regulate charitable organizations in the State of Maryland under the Maryland Solicitations Act, Md. Code Ann., Bus. Reg., § 6-205. The Maryland Attorney General has authority to file a lawsuit to enjoin violations of the Maryland Solicitations Act as set forth in Md. Code Ann., Bus. Reg., § 6-205(f). The aforementioned authority permits the Maryland Attorney General to seek a restraining order for appropriate relief, including provisions that enjoin further violations of the Maryland Solicitations Act; stop Defendants from making further charitable solicitations in the State of Maryland; and that secures payment of the charitable contributions received by the solicitor to charitable purposes or beneficiaries consistent with the purposes represented or beneficiaries named in the charitable solicitations which generated the contributions. Md. Code Ann., Bus. Reg., § 6-205(f)(1)-(6).

9. The State of Minnesota, by its Attorney General, Lori Swanson, ("Minnesota Attorney General"), brings this Complaint in the public interest and under the authority vested in Minnesota Statutes chapter 8, Minnesota Statutes sections 309.50-.61 ("Minnesota Charitable Solicitation Act"), and the Minnesota Attorney General's common law authority,

including *parens patriae* authority, to enforce Minnesota's laws, vindicate the state's sovereign and quasi-sovereign interests, and to remediate all harm arising out of - and provide full relief for - violations of Minnesota's laws. The aforementioned authority permits the Minnesota Attorney General to seek injunctive relief, restitution, other equitable relief, civil penalties of up to $25,000 per violation, the appointment of a receiver, suspension of a charitable registration, attorneys' fees, and costs and expenses of investigations and litigation to remedy the deceptive and unlawful conduct described in this Complaint.

10.  The State of Ohio, ex rel. Mike DeWine, Ohio Attorney General, Charitable Law Section ("Ohio Attorney General"), brings this Complaint in the public interest and under the authority vested in the Ohio Attorney General by O.R.C. § 109.23, et seq. ("Ohio Charitable Trust Act"), O.R.C. Chapter 1716 ("Ohio Organizations Act"), and the Ohio Attorney General's common law authority to enforce charitable trusts. The aforementioned authority permits the Ohio Attorney General to seek injunctive relief, rescission or reformation of trusts, restitution, and other equitable relief to prevent the waste, dissipation, and loss of charitable assets, and/or to stop ongoing donor deception caused by Defendants' violations of state law. These state laws and common law authority also authorize the Ohio Attorney General to obtain civil penalties, attorneys' fees, expenses, and costs.

11.  Plaintiff State of Oregon, by Ellen F. Rosenblum, Oregon Attorney General ("State of Oregon"), brings this Complaint in the public interest and under the authority vested in the Oregon Attorney General by ORS 128.610, et seq. ("Oregon Charitable Trust and Corporation Act"), ORS 128.801, et seq. ("Oregon Charitable Solicitations Act"), ORS 646.605, et seq. ("Oregon Unlawful Trade Practices Act"), and the Oregon Attorney

General's common law authority to enforce charitable trusts. The aforementioned authority permits the Oregon Attorney General to seek injunctive relief, rescission or reformation of trusts, restitution, and other equitable relief to prevent the waste, dissipation, and loss of charitable assets, and/or to stop ongoing donor deception caused by Defendants' violations of state law. These state laws and common law authority also authorize the Oregon Attorney General to obtain civil penalties, attorneys' fees, expenses, and costs.

12.     The Attorneys General of the States of Florida, California, Maryland, Minnesota, Ohio, and Oregon also bring this action pursuant to 15 U.S.C. § 6103(a) of the Telemarketing Act, which authorizes attorneys general as *parens patriae* to initiate federal district court proceedings to enjoin violations of, and enforce compliance with, the TSR, to obtain damages, restitution, and other compensation, and to obtain such further and other relief as the court may deem appropriate to stop Defendants' violations of the TSR.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the federal law claims pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), 6103(a), and 6105(b). This Court has supplemental jurisdiction over the subject matter of the state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), and (d), and 15 U.S.C. §§ 53(b) and 6103(e). Divisional venue is proper under M.D. Fla. L.R. 1.02.

## COMMERCE

15.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and engaged in "trade or commerce" as defined in Section 501.203(8), Florida Statutes.

## PLAINTIFFS

16.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.

17.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 6102(c), and 6105(b).

18.     The Florida Attorney General is the chief legal officer for the State of Florida, is broadly empowered to exercise all powers incidental to her office, and is the head of the Department of Legal Affairs and the Office of the Attorney General.  Fla. Const., art. IV, § 4(b); §§ 16.01, 20.11, Fla. Stat. (2018).  In this capacity, and pursuant to the Florida Not For Profit Corporation Act and the Florida Trust Code, the Florida Attorney General is

authorized, *inter alia*, to bring actions against not-for-profit corporations, including actions to prevent the improper use of a corporate charter and actions to enjoin the transaction of unauthorized business. The Florida Attorney General's powers also include the authority to protect the public interest in promoting charities. This authority arises both at common law, and under statute. *State ex rel. Landis v. S.H. Kress & Co.*, 155 So. 823 (Fla. 1934); §§ 617.0304(2)(c), 617.1420, 617.1430, 617.2003, Fla. Stat. (2018); § 736.0110(3), Fla. Stat. (2018). The Florida Attorney General's powers at common law include the power to bring suit in equity to "compel the trustees of a charitable trust to perform their duties as trustees, or to enjoin them from committing a breach of trust, or to compel them to redress a breach of trust, or to appoint a receiver to take possession of the trust property, or to remove the trustees and appoint other trustees." Restatement (Second) of Trusts §§ 391, 392 cmt. a (1959); *see also* § 15:5 Court Supervision and Control – Enforcement by Attorney General's Office, 18 Fla. Prac., Law of Trusts § 15:5 (2016-2017 ed.) ("It is recognized that the Attorney General is a proper party to enforce charitable trusts"); *see also* 16 Fletcher Cyc. Corp. § 7750 (2015 rev. volume) (Attorney General is a proper party to appoint general receiver for charitable corporation).

19.    The Florida Attorney General is also the enforcing authority under the FDUTPA pursuant to Section 501.203(2). The authority previously discussed herein authorizes the Florida Attorney General to pursue this action to enjoin violations of the FDUTPA, Florida's Solicitation of Contributions Act, the Florida Not For Profit Corporation Act, and the Florida Trust Code, and to obtain legal, equitable or other appropriate relief as enumerated in Paragraph 6 above.

20.     The California Office of the Attorney General brings this action on behalf of the People of the State of California through its Attorney General Xavier Becerra ("California Attorney General").  The California Attorney General has supervision and enforcement authority over charitable organizations, charitable trustees, and other charitable sector participants pursuant to the California Supervision Act, the California UCL, other statutory laws such as the TSR, and California common law.  For instance, the California Supervision Act prohibits unfair or deceptive acts involving charitable solicitations, and requires those that do business in California for charitable purposes to register with and report to the California Attorney General.  Cal. Gov't Code §§ 12580, 12585, 12586, 12599.6, 12599.8.  The California Supervision Act also authorizes the California Attorney General to issue cease and desist orders and assess penalties to regulated entities, and initiate court proceedings to enjoin law violations and secure other relief to correct the misuse of charitable assets.  Cal. Gov't Code §§ 12591, 12591.1, 12598.  Accordingly, the California Attorney General previously issued a cease and desist order and a notice of assessment of penalties against Defendant Help the Vets for numerous violations of the California Supervision Act and its regulations.  In addition, the California Attorney General files this action for the People of the State of California given additional law violations not covered by the cease and desist order against Defendant Help The Vets.

21.     The State of Maryland is represented by the Attorney General, Brian E. Frosh, the duly elected chief legal officer of the State of Maryland.  Together with the Secretary of State, John C. Wobensmith, the Attorney General is authorized to regulate and enforce Maryland's charitable solicitations laws.  Maryland Solicitations Act, Md. Code Ann., Bus.

Reg. Md. Code Ann., Bus. Reg. §§ 6-101 – 6-701 ("the Act"). Specifically, the Maryland Solicitations Act permits the Attorney General to seek injunctive relief for violations of the Maryland Solicitations Act including a restraining order that: (1) restrains further violations of the Act; (2) restrains the Defendants from making further charitable solicitations in Maryland; (3) recovers for the State of Maryland a civil penalty not to exceed $5,000 for each willful violation of the Act; (4) recovers for the State of Maryland a civil penalty not to exceed $3,000 for each grossly negligent violation of the Act; (5) enforces compliance with the Act; or (6) secures any other appropriate relief. Md. Code Ann., Bus. Reg. § 6-205(f). In addition, the Attorney General may commence an action in the public interest to "prevent, remedy, or obtain damages for the misapplication, diversion or waste of a charitable asset; or breach of fiduciary or other legal duty in the governance, management, or administration of a charitable asset." Md. Code Ann., Bus. Reg., § 6.5-102 (a)(3).

22.     The State of Minnesota, by its Attorney General, Lori Swanson, who is the chief legal officer of the State of Minnesota, is authorized under Minnesota Statues chapter 8; the Minnesota Charitable Solicitation Act, Minnesota Statutes sections 309.50-.61; and has common law authority, including *parens patriae* authority, to administer, enforce, and remedy violations of Minnesota's charitable solicitations laws. *See, e.g.,* Minn. Stat. §§ 8.31, 309.50-.61. Specifically, the Minnesota Attorney General is authorized to seek injunctive relief, restitution, other equitable relief, civil penalties of up to $25,000 per violation, the appointment of a receiver, suspension of a charitable registration, attorneys' fees, and costs and expenses of investigations and litigation. *See, e.g.,* Minn. Stat. §§ 8.31, 309.57, subd. 1.

23.     The Ohio Attorney General is the duly elected chief legal officer for the State of Ohio.  The Ohio Attorney General regulates charitable trusts and charitable solicitations in the State of Ohio through the authority vested in the office by the Ohio Charitable Trust Act, the Ohio Organizations Act, and Ohio common law.  The aforementioned authority permits the Ohio Attorney General to seek injunctive relief, rescission or reformation of trusts, restitution, and other equitable relief to prevent the waste, dissipation, and loss of charitable assets, and/or to stop ongoing donor deception caused by Defendants' violations of state law. These state laws and common law authority also authorize the Ohio Attorney General to obtain civil penalties, attorneys' fees, expenses, and costs.

24.     The Oregon Attorney General is the duly elected chief legal officer for Plaintiff State of Oregon.  The Oregon Attorney General regulates charitable trusts and charitable solicitations in the State of Oregon through the authority vested in the office by the Oregon Charitable Trust and Corporation Act, the Oregon Charitable Solicitations Act, the Oregon Unlawful Trade Practices Act, and Oregon common law.  The aforementioned authority permits the Oregon Attorney General to seek injunctive relief, rescission or reformation of trusts, restitution, and other equitable relief to prevent the waste, dissipation, and loss of charitable assets, and/or to stop donor deception caused by Defendants' ongoing or impending violations of state law.  These state laws and common law authority also authorize the Attorney General to obtain civil penalties, attorneys' fees, expenses, and costs.

## DEFENDANTS

25.     Defendant Help the Vets, also doing business as American Disabled Veterans Foundation, Military Families of America, Veterans Emergency Blood Bank, Vets Fighting

Breast Cancer, and Veterans Fighting Breast Cancer, is located in Orlando, Orange County,

Florida. Help the Vets transacts or has transacted business in this district and throughout the

United States. Help the Vets' board of directors, comprised largely of friends and family of

Defendant Paulson, ostensibly governs its operations. Articles of Incorporation representing

that Help the Vets is a not-for-profit corporation were filed in Florida in 2013 and Help the

Vets was recognized as tax-exempt by the IRS under Section 501(c)(3) of the Internal

Revenue Code. Notwithstanding this, Help the Vets is organized to carry on business for its

own profit or that of its members within the meaning of Section 4 of the FTC Act. Help the

Vets has been the subject of previous law enforcement actions by the California Attorney

General, as mentioned in Paragraph 20, above, and the Michigan Attorney General.

26.     Defendant Paulson is over the age of twenty-one and is not currently in the

military service. Paulson was president of Help the Vets until the end of 2016, when his

long-time associate Sherwood Shoff took over the presidency and Paulson assumed the roles

of secretary and treasurer. He also has been a full-time employee of Help the Vets since its

creation, and its only employee for most of that time. He currently resides in this district, in

Orlando, Orange County, Florida, and transacts or has transacted business in this district and

throughout the United States. At all times material to this Complaint, acting alone or in

concert with others, Paulson has formulated, directed, controlled, had the authority to control,

or participated in the acts and practices of Help the Vets, including the acts and practices set

forth in this Complaint. From 2013 through 2016, in his dual role of president and full-time

employee, Paulson managed Help the Vets' fundraising activities, finances, and all its day-

to-day activities. In 2017 and continuing through the present, Paulson has remained an

employee and continued running the corporation's day-to-day activities. In 2014, Paulson founded another sham charity, Breast Cancer Outreach Foundation, Inc. ("Breast Cancer Outreach Foundation"). Acting alone or in concert with others, Paulson formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Breast Cancer Outreach Foundation through at least 2016.

## DEFENDANTS' BUSINESS ACTIVITIES

27.    Help the Vets claims to be a legitimate charity whose primary purpose is to assist veterans, especially amputees and those who are otherwise disabled. To support its operations, Help the Vets hired for-profit fundraisers to solicit donations via telemarketing and direct mail, including sweepstakes mailers. On behalf of Help the Vets, Paulson negotiated and signed contracts with these fundraisers, including telemarketers Courtesy Call and Donor Relations. *See* Attachment A (Representative Solicitations). He also routinely approved the telemarketing scripts and direct mail materials used by the fundraisers to solicit donations.

28.    Through the solicitation materials approved by Defendants, fundraisers misrepresented the nature and purpose of Help the Vets, the purposes for which contributions would be used, and the amount of donors' contributions that would be used for particular charitable programs.

29.    Using for-profit fundraisers was an expensive proposition for Help the Vets – and its donors. Telemarketers were paid 85% to 90% of every dollar they raised. Although the companies providing direct mail services to Help the Vets were not compensated on a percentage basis like telemarketers were, in some instances Help the Vets' direct mail

expenses exceeded its telemarketing expenses. From 2014 to 2016, Help the Vets paid more than 88% of donors' contributions to fundraisers.

30.     In addition to raising money under its own name, Help the Vets solicited donations using several fictitious business names, including American Disabled Veterans Foundation, Vets Fighting Breast Cancer, and Military Families of America. These dbas, by their very names, suggested that donations would be used for specific programs to aid veterans. The varied business names also allowed fundraisers to solicit the same donor on multiple occasions for what appeared to be different charities. A donor who might balk at sending Help the Vets multiple donations in a short period of time, for example, might be willing to give to Help the Vets, then American Disabled Veterans Foundation, then Vets Fighting Breast Cancer, and then Military Families of America.

31.     Help the Vets, from 2013 through 2017, directly and through for-profit fundraisers, actively solicited contributions from donors nationwide. This includes actively soliciting contributions in Florida, California, Maryland, Minnesota, Ohio, and Oregon, states in which it was registered to solicit contributions. It made claims throughout this period about its mission and programs on its websites; in telemarketing scripts; in pledge letters; and in direct mail solicitations, including sweepstakes offers – all of which were approved by Paulson. Whether acting in its own name or in the guise of one of its dbas, Help the Vets framed its solicitations with claims about the urgency or importance of the need. Letters reminding donors to send in their pledged donations claimed that "Help the Vets is being called upon to provide countless essential services in the coming months for the thousands of military veterans injured in Iraq, Afghanistan and previous conflicts," and "We need your

help as never before." Brochures and pledge letters for Help the Vets' dba, American

Disabled Veterans Foundation, exhorted donors that through their contributions they could

"REACH OUT! Let's Help Our Disabled Veterans And Their Families!" and "HELP

DISABLED VETERANS IN OUR COUNTRY." Fundraisers emphasized that even the

smallest contribution could help amputees and other seriously injured veterans. For example,

a direct mail letter signed by Paulson stated:

> But for thousands of disabled veterans who served in Iraq and Afghanistan,
> "giving an arm and a leg" isn't simply a figure of speech – it's a harsh reality.
> . . . Your $10 gift will mean so much to a disabled veteran.

In some cases, telemarketers were instructed to tell reluctant donors:

> [W]e wouldn't want something like that to keep you from supporting our
> disabled veterans. Many of these vets have spent years in the hospital. They
> need our support.

Even the "donor levels" that telemarketers used to describe donation amounts reinforced the

critical help donors provided: "Warrior" level, "Hero" level, and "Life Saver" level.

     32.     These statements about the urgency and importance of the appeal amplified

and reinforced descriptions of the charity and the specific "programs" that contributions

would support. Among other things, donors were told that contributions would be used to

assist disabled veterans, including through grants and medical help; operate a 24-7 suicide

prevention hotline; provide retreats for veterans; and assist veterans fighting breast cancer.

### *No Grants or Medical Care to Disabled Veterans*

     33.     Promises to help disabled veterans have been prominently featured in

numerous solicitations for Help the Vets and its dba American Disabled Veterans

Foundation. Help the Vets represented to donors that its "mission" was to help wounded and

disabled veterans, especially amputees and severely injured vets returning home from Iraq

and Afghanistan.  Similarly, donors to dba American Disabled Veterans Foundation were

told that its "mission" was to "provide grants to help thousands of Disabled Veterans and

their families while raising funds from non-corporate donors."  When asked "What is Help

the Vets?"  Help the Vets' professional telemarketers were directed to reply:

> The mission of Help the Vets, Inc. is to provide assistance to amputees and
> severely injured vets returning from the war in Iraq and Afghanistan, who
> cannot afford the continuing home therapy and equipment needed to restore
> and maintain their health when their clinical therapy is over and they are
> discharged to home treatment.

Pledge letters sent to donors contained the same statement.

34.     Help the Vets repeatedly claimed that donors' contributions would be used to

provide medical assistance and other support to disabled veterans.  One pledge letter

explained to donors that, "We at Help the Vets (HTV) are helping our disabled veterans cope

with expenses related to service related injuries and adjust to living with disabilities."  A

different fundraising campaign stated that, "It is because of donors like you that HTV can

continue to provide essential services to support our needy and disabled military veterans."

In another solicitation, Help the Vets told donors that it "provid[es] physician treatment

through supporting physicians for veteran's [sic] with physical problems not covered by the

Veterans Administration."  Claims on the dba American Disabled Veterans Foundation

website and in its direct mail solicitations were even more specific about providing medical

assistance to disabled veterans:

> 750,000 veterans nationwide are awaiting disability claims through the VA
> and the average wait is over 340 days.  Some treatment is only available for
> veterans with 100% disability.  That is why we raised and donated over

$460,000 in medical care last year to veterans who were not receiving VA treatment.

35.     Telemarketers for dba American Disabled Veterans Foundation did not simply describe its *mission* as providing grants to disabled veterans, they also told donors contributions would be used for that purpose: "Funds raised during this drive will be used towards grants to help thousands of Disabled Veterans and their families." The pledge letter sent to individuals who had promised to donate further highlighted that the organization was purportedly helping disabled veterans:

> It is because of citizens like you that American Disabled Veterans Foundation is able to continue its efforts on behalf of those afflicted with combat related injuries, substance abuse and homeless issues.

36.     Claims that Help the Vets would use donors' contributions to support programs that helped disabled veterans were false or misleading. The specific programs touted to donors did not exist as described. For example, Help the Vets operated no program that provided financial assistance to disabled veterans or otherwise provided them with grants. When reporting program expenditures in its Forms 990 filed with the IRS, Help the Vets reported spending *nothing* on grants or financial assistance to individual veterans, disabled or otherwise. These forms were signed under penalty of perjury by Paulson (2014 and 2015 Forms 990) and Sherwood Shoff (2016 Form 990).

37.     Also false or misleading was Help the Vets' claimed "mission" of helping wounded and disabled veterans, especially amputees and severely injured vets, as well as its claims of funding or otherwise providing veterans with medical care. Help the Vets engaged in virtually no special efforts to help amputees and severely injured vets. Nor did Help the Vets operate any kind of program to fund the purchase of "home therapy and equipment" for

"amputees and severely injured vets returning from the war in Iraq and Afghanistan, who cannot afford the continuing home therapy and equipment needed to restore and maintain their health when their clinical therapy is over and they are discharged to home treatment" as it claimed.

38.     Nor did Help the Vets fund medical assistance for veterans.  The purported "medical services" Help the Vets provided consisted of giving away vouchers for chiropractic treatment redeemable only at one clinic in Winter Garden, Florida.  For the most part, Paulson simply randomly distributed these vouchers to veterans' organizations or at events like a 2015 marathon in Orlando, Florida, where anyone, veteran or not, could pick them up.  Between 2013 and July 2017, at most five such vouchers were redeemed.  Neither Paulson nor Help the Vets has any idea whether those five vouchers were used by veterans, much less "amputees" or "severely injured" combat veterans.  In addition, Help the Vets reported giving away the chiropractic vouchers only in 2014 and 2015; there is no evidence that Help the Vets did anything resembling providing medical assistance to veterans in 2016 – even though it continued to tell donors that contributions would be used for this purpose.

39.     Help the Vets used the chiropractic vouchers it distributed to deceive donors in another way as well.  Despite having no evidence that any veteran had been assisted by the vouchers, and paying nothing for them, in its 2014 and 2015 Forms 990 Help the Vets reported the full face value of each voucher it distributed as a "program service" that assisted veterans.  This inflated Help the Vets' reported program revenue and spending by almost $1 million and gave the appearance that Help the Vets had assisted more veterans than it actually had.

### *No Suicide Prevention Program*

40.     While helping disabled veterans was prominently featured in solicitation materials, Help the Vets also told donors that it operated other programs that assisted veterans.  For example, Help the Vets claimed to provide a 24-hour suicide prevention program for veterans.  Fundraising pitches claimed that "22 VETERANS WILL DIE EACH DAY UNLESS WE DO SOMETHING." [Capitalization in original.]  In telemarketing scripts, written solicitations, and on its websites, Help the Vets urged donors to contribute to its "24-7 suicide prevention hotline."  The same urgent plea was repeated in solicitations for dba American Disabled Veterans Foundation: "HELP US PREVENT SUICIDE BY DONATING TO OUR 24-7 SUICIDE PREVENTION HOTLINE!" [Capitalization in original.]

41.     In fact, Help the Vets had no suicide prevention program.  The "suicide prevention hotline" was not staffed by persons trained in suicide prevention; instead, callers seeking a suicide prevention hotline reached Paulson's personal cell phone.  Paulson deemed himself qualified to staff the "suicide hotline" due to his undergraduate degree in psychology and some "post-graduate course work in psychology."  Help the Vets described the suicide prevention hotline to donors, but did not advertise it to veterans in need.  As a result, very few veterans even called for help; Paulson reported answering an estimated 36 calls per year in 2015 and 2016.  Other than the "hotline," Help the Vets ran no suicide prevention programs.  Even though Help the Vets' websites and other fundraising materials suggested that preventing suicide among veterans was a key goal, and urged donors to contribute generously, donations were not used for this purpose.

### *No Therapeutic Family Retreats*

42.     Help the Vets also told donors that it operated programs that provided respite for veterans recovering from the stress of war.  For example, the website for dba American Disabled Veterans Foundation described providing "family retreats" that "help service members adjust back into their family life and . . . facilitate family nurturing for service members returning from duty, in need of therapeutic retreats."  A telemarketing script for Help the Vets described the program this way:  "Donated hotel inventory is gathered and provided to veteran families in need of time alone together. . . ."

43.     In fact, Help the Vets had no "family retreat" program.  Its "retreats" and "donated hotel inventory" consisted primarily of timeshare vouchers for use chiefly in Mexico.  The paper vouchers did not offer reimbursement for airfare, nor did they cover taxes and fees that could easily add up to several hundred dollars.

44.     Help the Vets distributed thousands of these vouchers, but with one exception, there is no evidence that they were used.  According to the provider of the vouchers, Sunset World, since 2013 only *two* of the thousands of Mexico vouchers distributed by Help the Vets were ever used to make reservations.  One of the two vouchers was used in 2013 by Sherwood Shoff, a veteran who was on the Help the Vets board at the time he redeemed the voucher, and is currently the board president.  Whether the only other reservation was made by a veteran is unknown, as is whether the voucher was redeemed.  There is no evidence that any vouchers were used between 2014 and 2017.

45.     Nor does Help the Vets have evidence that most vouchers it distributed went to veterans.  Many of the vouchers were not given directly to veterans by Help the Vets itself;

instead they were provided to other veterans organizations. In numerous instances, when giving the vouchers to other organizations, Help the Vets did not restrict the vouchers' distribution to veterans. For example, on several occasions when Paulson gave away timeshare vouchers, he noted that they could be used in fundraising efforts, as raffle prizes or for silent auctions. At least once, Help the Vets distributed vouchers to all participants – veterans or not – in an Orlando marathon.

46.     As with its vouchers for chiropractic care, Help the Vets used these timeshare vouchers to inflate how much it allegedly spent on programs that assisted veterans. Help the Vets paid nothing for the time share vouchers. In its IRS filings for 2014, 2015, and 2016, Help the Vets reported the supposed full fair market value of the vouchers it gave away as "program" spending that assisted veterans with lodging. In other words, every voucher Help the Vets distributed – whether used or not – was counted as redeemed, and the purported value of the vouchers was reported as part of the program benefits that Help the Vets provided to veterans. Thus, in 2014, for passing out thousands of these vouchers, not one of which can be shown to have helped a veteran, Help the Vets reported program spending of $770,000. In 2015, reported program spending on what Help the Vets described as "vouchers for veteran lodging" more than quadrupled to $3,654,300. More veterans were not helped that year, but Help the Vets did pass out more pieces of paper. In 2016, the apparent size of the program increased again, as Help the Vets reported program spending of $8,333,600 on "certificates for veterans lodging." Thus, in the span of three years, from 2014 through 2016, Help the Vets reported that it spent $12,757,900 helping veterans with lodging and family retreats even though virtually no veterans benefitted.

### *No Aid to Individuals with Breast Cancer*

47.     Help the Vets told donors that their contributions would be spent helping

veterans in other specific ways, as well.  Through the dbas "Vets Fighting Breast Cancer,"

and "Veterans Fighting Breast Cancer," Help the Vets told donors its mission was to provide

"treatment resources to U.S. Veterans diagnosed and suffering with breast cancer. . . ."  More

specifically, Help the Vets claimed that contributions would be used towards:

> [E]ducation, prevention and treatment of breast cancer in US Veterans
> diagnosed with breast cancer.  Programs include education, providing grants
> for screening, mammography, surgery, chemotherapy and follow up care not
> covered by the Veterans Administration.

48.     Despite raising over $776,000 for this specific purpose, Help the Vets did not

make a single grant to a veteran with breast cancer.  It had no programs that provided aid to

U.S. veterans suffering from breast cancer or offered grants for screening, mammography,

surgery, chemotherapy, or follow up care for veterans fighting breast cancer.  Its largest

donation in any way nominally related to breast cancer was a 2015 "grant" for $18,000 to

Breast Cancer Outreach Foundation, the other "charity" run by Paulson.  That organization

did not report in its 2015 Form 990 using any funds to assist individual U.S. veterans with

breast cancer.  While Help the Vets also made a handful of other small donations directly to

organizations researching a breast cancer vaccine, donors' money was not used for breast

cancer screening, mammography, surgery, or the other purposes related to helping veterans

fight breast cancer that were described to them.

### *Other False Program Claims*

49.     Help the Vets made other deceptive claims to donors about its programs and

how contributions would help veterans, claiming, for example, to provide mental health

counseling for veterans suffering from PTSD, substance abuse assistance, employment

counseling, and educational scholarships for "individuals with serious injuries, amputees, and

paralyzed veterans from the Iraq or Afghanistan wars."  For example, one pledge letter for

Help the Vets described its many supposed programs, telling individuals who had promised

to donate:

> It is because of citizens like you the [sic] Help the Vets, Inc. is able to
> continue its efforts on behalf of our veterans. . . . Counseling is also provided
> to veterans in areas that are not covered by [VA] benefits, including
> employment counseling, mental health counseling and referral to other
> agencies when appropriate.

50.     These representations were false or misleading.  Help the Vets has not

operated programs that provide counseling on mental health issues, substance abuse

problems, or employment, and has not provided educational scholarships for veterans.  At

best, Help the Vets may have directly helped a handful of individual veterans and sent some

checks to other charities that might provide veterans with benefits, but with no guarantee or

assurance that such charities would spend the donation on any of the programs Help the Vets

had described to its donors.  Given that Help the Vets spent the vast majority of donations

paying fundraisers, compensating Paulson, and on other non-program activities, its spending

on any of these specific activities was merely incidental, and it was deceptive to claim that

Help the Vets was dedicated to such programs or would spend donors' funds on such

programs.

51.     Help the Vets did spend some of donors' contributions to ship donated gifts-

in-kind like toiletries and clothing to other veterans' organizations, often to be used at "stand

down" events.  Such events, typically coordinated by the Veterans Administration, provide

assistance to veterans, including homeless veterans. Help the Vets, however, has no records regarding how many veterans benefitted from its donations or even whether all the donated goods were used by event organizers. It also has no evidence that such toiletries and clothing were used to assist amputees and severely injured vets returning from the Iraq and Afghanistan wars – Help the Vets' supposed mission.

52.     Help the Vets also donated some cash to the Red Cross and other organizations that ran blood banks. These donations represented the program services Help the Vets purported to provide related to donations raised under its dba Vets Emergency Blood Bank. Donors contributed $754,005 to that dba and Help The Vets spent $27,000 – just 3.6% – of that making donations to legitimate blood banks. Had donors known this was the "program" they were supporting, they could have contributed directly to the Red Cross.

### Help the Vets Misrepresents that Donations Will Be Spent for Charitable Purposes, and Is a Sham Charity

53.     Between 2014 and the end of 2016, donors contributed $11 million in cash to Help the Vets. Central to its fundraising success has been the overarching claim that donors' contributions would support a legitimate charity dedicated to assisting veterans. Help the Vets has made this claim, directly or indirectly, in phone calls, mailers, pledge letters, websites, and other solicitation materials. Time after time donors were told of the important "missions" of Help the Vets and its dbas, and how essential contributions were to support important work. For example, Help the Vets' pledge letters have stated:

> Thank you for taking the time to speak with one of our callers and making a pledge of support. You have joined us in sharing concern for our veterans returning from the wars in Iraq and Afghanistan. Please accept our thanks and be assured we will work daily to earn your continued support.

Pledge letters for dba American Disabled Veterans Foundation similarly thanked donors:

> It is because of citizens like you that American Disabled Veterans Foundation, Inc. is able to continue its efforts on behalf of those afflicted with combat related injuries, substance abuse and homeless issues. . . . Please we need your help today! Our goals and success completely depend on promised commitments from people like you.

Other donors were told that "Help the Vets is on the front lines of efforts to support our disabled veterans. But your support has never been more important than it is today." Even Help the Vet's fictitious names and website addresses have projected the image of an organization dedicated to veterans: www.helpthevets.org, www.vetsbloodbank.com, www.vetsfightingbreastcancer.com, "Disabled Veterans of America," and others.

54.     Help the Vets bolstered its supposed legitimacy as a charity by claiming to have been "rated gold by GuideStar, a non-profit charity-rating organization." Such representations appeared, for example, in a fundraising mailer in which Help the Vets stated that it had been "recognized by GuideStar.org for efforts which provided over $1,000,000 of benefits to injured Veterans in 2013." The same claim was made in a brochure given to prospective donors by dba American Disabled Veterans Foundation. These statements suggest that an independent organization vetted Help the Vets' programs and approved of the manner in which it operated. This claim is false. GuideStar does not rate charities or evaluate the programs, governance, or effectiveness of any organization. Any claims to the contrary misrepresent the nature and purpose of GuideStar. On its website, GuideStar explains:

> Many people think that we are a charity evaluator or a watchdog. We aren't. Instead, we are a 501(c)(3) public charity that collects, organizes, and presents the information you want in an easy-to-understand format while remaining neutral.

55.     Despite its claims about important charitable missions, the urgent need for donors' support, its evocative fictitious names, and claimed gold star rating, Help the Vets is not a legitimate charity.  It is dedicated neither to the public good nor to helping veterans. Rather, it has existed to benefit Paulson and the for-profit fundraisers he hired.

56.     Help the Vets does not operate like a bona fide charity with an independent board that oversees programs and finances and ensures that donations are used to further the charity's mission.  Instead, Paulson has recruited his mother, son, brother, brother-in-law, and family friends to serve on the board.  They have exercised little substantive oversight over Paulson or Help the Vets, but have approved substantial salary, raises, and benefits for Paulson.  Between 2014 and 2016, Help the Vets spent $10.5 million – 95% – of the $11 million in cash donors contributed paying Paulson, fundraisers, and overhead expenses. Only after the *private* interests of Paulson and the fundraisers were served, and other administrative costs paid, could the remaining pittance of each donation support any programs for veterans, disabled, wounded, or otherwise.

57.     Help the Vets' large-scale spending on private interests was permitted and perpetuated by its board of directors.  Unlike boards of legitimate charities, Help the Vets' board exercised little or no oversight over the organization's programs, fundraising, or spending, leaving these crucial matters up to Paulson.  For example, the board had no established policies or procedures for participating in or reviewing Paulson's decisions.  Nor did it have any method for evaluating the effectiveness of the "services" Help the Vets supposedly provided to veterans.  Had the board exercised independent oversight, it would have questioned the spiraling reported program spending on veterans' lodging vouchers.

Even though the reported provision of veterans' lodging certificates swelled from $770,000 in 2014 to more than $8 million in 2016, Help the Vets did not need to add additional staff for the program, did not tout its expanded program accomplishments to the public, or, more fundamentally, examine whether these vouchers even helped veterans (they did not). Nor did the board question the practice of reporting unused chiropractic vouchers as a program service, or describing such vouchers, available only at one Florida clinic, as a method of providing medical assistance to wounded and disabled veterans, especially amputees and severely injured vets. Here too, had the board been exercising its fiduciary oversight duty and asked, it would have discovered that these vouchers provided no meaningful benefits to veterans.

58.     Fundraising decisions – from hiring fundraisers to negotiating contracts and approving solicitation materials – were made almost exclusively by Paulson. So too were other financial decisions. Paulson signed Help the Vets' checks and was solely responsible for meeting with the auditors and accountants. The board provided virtually no financial oversight, rubberstamping even important documents like IRS Forms 990.

59.     Unlike legitimate charity boards, Help the Vets' board failed to review Paulson's performance or his success in achieving its goals. The board did not consider, for example, that Paulson negotiated seriously disadvantageous contracts with fundraisers and approved deceptive solicitations that drew the attention of multiple law enforcement agencies. Without scrutiny or question, the board voted to give Paulson raises and valuable benefits. In May of 2015, for example, the board established a 401(k) pension account for Paulson, and pledged to match Paulson's own contributions up to a total of 25% of his salary.

This board decision was made by Paulson's mother and son. As a result, over two years, Help the Vets poured more than $70,000 into Paulson's 401(k) account. In August of 2015, the board approved payment of Paulson's medical and dental care ($20,000) *retroactively* back to January of 2013. Voting board members were Paulson's mother, brother, and son. Between these benefits and annual raises, the amount Help the Vets paid Paulson more than tripled between 2014 and 2016, going from $78,000 in 2014 to almost $242,000 in 2016.

60.     Help the Vets' board minutes – often no longer than a few lines handwritten by Paulson reflecting meetings that typically lasted 20 to 30 minutes – show little discussion about whether or how the organization could benefit veterans, or about the promises Help the Vets was making to donors. The board, however, did discuss whether it should purchase insurance to shield its officers and directors from liability. At another meeting, the board discussed "killing" some of Help the Vets' assumed names because they "open us up to additional scrutiny." The board also decided to fund a lawsuit against parties who criticized Paulson and Help the Vets for overspending on fundraising and salary while devoting very little to actual veterans programs.

61.     The board's failure to operate Help the Vets as a bona fide charity is also demonstrated by its explicit or tacit agreement to pay for-profit telemarketers 85% – 90% of each donation and to enter into a contract with direct mail fundraiser Direct Response Consulting Services, Inc., that resulted in reported payments to that fundraiser of 94% of funds it raised in 2016. For some charities, high fundraising costs can be attributed to start-up expenses or seeking support for unpopular causes. That is not the case here. Help the Vets has existed since 2013, and support for wounded and disabled veterans is scarcely an

unpopular cause. The board's acquiescence to high fundraising costs resulted in very little money left available to be spent on legitimate programs for veterans – but did allow Paulson to earn high pay and good benefits with *de minimis* results for the veterans Help the Vets claimed to serve.

62.     In short, Paulson and the Help the Vets board condoned fundraising practices that were likely to mislead donors; failed to evaluate whether Help the Vets was actually serving veterans in meaningful ways; and agreed to contracts that shunted the vast majority of donors' money to for-profit fundraisers instead of to the veterans' services Help the Vets had pledged to provide.

### Paulson's Role in the Deceptive Practices

63.     Paulson participated in, controlled, or had the authority to control the deceptive acts and practices of Help the Vets. Among other things, Paulson was one of the initial incorporators of Help the Vets, its sole full-time employee, and in charge of all daily business. Paulson served as president of Help the Vets from its founding in 2013 until the end of 2016; thereafter, he served – and continues to serve – as treasurer and secretary. Between 2014 and 2016 he was compensated more than $462,000 including benefits and a 401(k) plan, and he has continued to draw a salary through 2017 to the present. In addition, since its founding, Paulson has operated Help the Vets from his own home and collected rent from Help the Vets to do so. Paulson also recruited or helped recruit family and friends to the board of directors – the group he needed to approve his salary and benefits.

64.     Paulson has routinely signed checks disbursed by the organization, controlled Help the Vets' bank accounts, and communicated with auditors and accountants about

revenues, expenses and allocations of amounts reported in its Forms 990. Additionally, from 2013 through at least 2016, Paulson managed all Help the Vets fundraising activities, including negotiating and signing contracts with for-profit fundraisers and approving deceptive telemarketing scripts, pledge letters, and other materials used to solicit donations. Given his control over Help the Vets' finances and its spending, Paulson knew that many of the representations he approved were false or misleading. He knew, for example, that Help the Vets did not provide grants to thousands of disabled veterans, provide grants to assist U.S. veterans struggling with breast cancer, award educational scholarships, or provide veterans with medical care. Paulson knew that Help the Vets did not run a "family retreat" program that provided housing to veterans. And he knew that the vast majority of funds solicited from donors were spent paying fundraisers, his salary, and administrative expenses – and would never be spent helping veterans.

65.    Paulson similarly controlled his other "charity," Breast Cancer Outreach Foundation. He populated that board with many of the same friends and relatives serving on the board of Help the Vets (for example, six of the seven directors overlapped in 2015). He hired some of the same fundraisers, negotiated similar high percentage contracts, and approved scripts and solicitation materials that misled donors. He also collected a salary from the organization. In 2016, for example, while he reported working 40 hours per week at Help the Vets, for which he received compensation of almost $242,000, Paulson also reported working 40 hours per week at Breast Cancer Outreach Foundation, for which he received compensation of over $192,000. Paulson's brother and three other people served on the boards of both organizations and apparently approved this compensation.

66.     While in charge of both organizations, Paulson caused Help the Vets to donate $18,000 to Breast Cancer Outreach Foundation. He did this even though in his capacity as president of Breast Cancer Outreach Foundation he knew that more than 85% of cash donations to it were spent on administrative expenses, paying Paulson's salary, and on fundraising.

67.     Paulson was also in charge of Breast Cancer Outreach Foundation when the Michigan Attorney General investigated it for, among other things, charitable solicitation fraud. As a result of that investigation, Breast Cancer Outreach Foundation, in a settlement signed by Paulson, agreed to stop soliciting in Michigan for ten years and paid the Michigan Attorney General $150,000. In addition, under the settlement, Paulson agreed that there would be no future connection between Paulson and Breast Cancer Outreach Foundation.

## KNOWING AND WILLFUL MISREPRESENTATIONS

68.     Defendants knowingly and willfully misrepresented to donors that Help the Vets was a legitimate charity and that donations would be used to support specific charitable programs to assist veterans, including funding medical assistance to veterans, operating suicide prevention programs, and providing retreats. In reality, and as Defendants knew, the overwhelming majority of the cash collected was used to benefit Paulson and the fundraisers; and the so-called "charitable" programs described to donors provided little or no assistance to veterans, disabled or otherwise. Under these circumstances, Defendants knowingly and willfully engaged in deceptive solicitations.

## HARM TO DONORS AND VETERANS

69.     Between 2014 and the end of 2016, donors contributed more than $11 million to Help the Vets and unaudited financials show an additional $9 million was contributed in 2017. Donors were told that their money was going to help veterans, especially disabled or wounded veterans. In fact, because the vast majority of donations supported the private interests of for-profit fundraisers and Paulson, only a small fraction of the money collected was ever available for spending to help veterans. In many instances, no money was spent to help veterans with the programs described to donors. Under these circumstances, Help the Vets misled donors and wasted their charitable contributions. In addition, donors had less money available to support legitimate charities that operate real programs to help disabled and wounded veterans or support other worthy causes. Thus, donors' charitable intentions were frustrated and veterans actually in need of assistance were harmed.

## VIOLATIONS OF THE FTC ACT

70.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

71.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

### MISREPRESENTATION THAT CONTRIBUTIONS GO TO CHARITY
### (By Plaintiff FTC)

72.     Plaintiff FTC incorporates by reference Paragraphs 27 – 69, above.

73.     In numerous instances, in connection with soliciting charitable contributions from donors, Defendants have represented, directly or indirectly, expressly or by implication,

that donors' cash contributions would go to charity to be used primarily to assist veterans, especially those who are wounded or disabled.

74.     In truth and in fact, in numerous instances donors' cash contributions have not gone to charity to be used primarily to assist veterans.  Instead, the contributions have gone to a corporation controlled by an individual for his personal pecuniary gain.

75.     Therefore, Defendants' representation as set forth in Paragraph 73 of this Complaint is false or misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### MISREPRESENTATION THAT CONTRIBUTIONS WERE FOR SPECIFIED CHARITABLE PURPOSES
### (By Plaintiff FTC)

76.     Plaintiff FTC incorporates by reference Paragraphs 27 – 69, above.

77.     In numerous instances in connection with soliciting charitable contributions, Defendants have represented, directly or indirectly, expressly or by implication, that donors' contributions would be used to assist veterans, including, in numerous instances, that donations would be spent helping disabled veterans with grants, providing medical assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or other lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

78.     In truth and in fact, little or none of the donors' contributions have been spent assisting veterans, including helping disabled veterans with grants, providing medical assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

79.     Therefore, Defendants' representation as set forth in Paragraph 77 of this
Complaint is false or misleading and constitutes a deceptive act or practice in violation of
Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### MISREPRESENTATION THAT HELP THE VETS WAS "RATED GOLD" BY AN INDEPENDENT CHARITY-RATING ORGANIZATION
### (By Plaintiff FTC)

80.     Plaintiff FTC incorporates by reference Paragraphs 27 – 69, above.

81.     In numerous instances, in connection with soliciting charitable contributions,
Defendants have represented, directly or indirectly, expressly or by implication, that Help the
Vets was "rated gold" for its veterans' programs by an independent charity-rating
organization.

82.     In truth and in fact, Help the Vets was not "rated gold" for its veterans'
programs by an independent charity-rating organization.  The independent organization to
which Help the Vets' solicitations have referred, GuideStar, does not evaluate the programs,
governance, or effectiveness of any organization.

83.     Therefore, Defendants' representation as set forth in Paragraph 81 of this
Complaint is false or misleading and constitutes a deceptive act or practice in violation of
Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### VIOLATION OF THE TELEMARKETING SALES RULE

84.     In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and
deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C.

§§ 6101 – 6108.  The FTC adopted the original Telemarketing Sales Rule in 1995,

extensively amended it in 2003, and amended certain sections thereafter.  16 C.F.R. Part 310.

85.     The TSR defines "charitable contribution" to mean "any donation or gift of

money or any other thing of value."  16 C.F.R. § 310.2(h).

86.     The TSR defines "donor" to mean "any person solicited to make a charitable

contribution."  16 C.F.R. § 310.2(p).

87.     The TSR defines "person" to mean "any individual, group, unincorporated

association, limited or general partnership, corporation, or other business entity."  16 C.F.R.

§ 310.2(y).

88.     The TSR defines "telemarketer" to mean "any person who, in connection with

telemarketing, initiates or receives telephone calls to or from a customer or donor."

16 C.F.R. § 310.2(ff).

89.     The TSR defines "telemarketing" to mean, in pertinent part, "a plan, program,

or campaign which is conducted to induce the purchase of goods or services or a charitable

contribution, by use of one or more telephones and which involves more than one interstate

telephone call."  16 C.F.R. § 310.2(gg).

90.     Section 310.3(a)(4) of the TSR prohibits telemarketers from making a false or

misleading statement to induce a charitable contribution.

91.     Sections 310.3(d)(1), (3), and (4) of the TSR prohibit telemarketers from

misrepresenting, directly or by implication: the nature, purpose, or mission of an entity on

behalf of which a charitable contribution is being requested; the purpose for which any

charitable contribution will be used; or the percentage or amount of any charitable contribution that will go to a charitable organization or to any particular charitable program.

92.     The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates, *inter alia*, Sections 310.3(a) or (d) of the TSR. 16 C.F.R. § 310.3(b).

93.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### ASSISTING & FACILITATING TELEMARKETING VIOLATIONS
### (By All Plaintiffs)

94.     Plaintiffs incorporate by reference Paragraphs 27 – 69, above.

95.     In numerous instances in connection with soliciting charitable contributions by telephone, Defendants have provided substantial assistance or support to telemarketers while knowing or consciously avoiding knowing that the telemarketers were engaged in acts or practices that violate Sections 310.3(a)(4) and 310.3(d)(1), (3), and (4) of the TSR.

96.     Defendants' acts or practices, as described in Paragraph 95 of this Complaint, violate Section 310.3(b) of the TSR. 16 C.F.R. § 310.3(b).

## STATE LAW VIOLATIONS

## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## ("The FDUTPA")

97.     When construing whether acts or practices violate the FDUPTA, it is the intent of the legislature that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to § 5(a)(1) of the Federal Trade Commission Act, 15, U.S.C. § 45(a)(1)." Section 501.204(2), Florida Statutes (2018).

98.     Section 501.204 of the FDUTPA provides ". . . deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

99.     A person that willfully engages in a deceptive or unfair act or practice is liable for a civil penalty of Ten Thousand Dollars ($10,000.00) for each such violation, pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000.00) for each violation victimizing a senior citizen or military service member, pursuant to Section 501.2077, Florida Statutes.  Willful violations of the FDUTPA occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

100.    At all times relevant to this action, Defendants engaged in "trade or commerce" as defined in Section 501.203(8), Florida Statutes, and continue to engage in "trade or commerce."

## COUNT V

### MISREPRESENTATION THAT CONTRIBUTIONS WERE FOR SPECIFIED CHARITABLE PURPOSES IN VIOLATION OF THE FDUTPA
(By State of Florida Against All Defendants)

101.     Plaintiff Florida Attorney General adopts, incorporates by reference and re-alleges Paragraphs 1 – 71 and 97 – 100 as if fully set forth herein.

102.     In numerous instances in connection with soliciting charitable contributions, Defendants have represented, directly or indirectly, expressly or by implication, that donors' contributions would be used to assist veterans, including, in numerous instances, that donations would be spent helping disabled veterans with grants, providing medical assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or other lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

103.     In truth and in fact, little or none of the donors' contributions have been spent assisting veterans, including helping disabled veterans with grants, providing medical assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or other lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

104.     Additionally, Defendants' conduct as described in Paragraphs 119, 120, 126, and 127 of this Complaint constitutes violations of the FDUTPA.

105.     At all times material to this Complaint, acting alone or in concert with others, Paulson has formulated, directed, controlled, participated in, or had the authority to control, the acts and practices of Help the Vets, including the acts and practices set forth in this Complaint.

106.    The Defendants willfully engaged in these deceptive acts and practices because the Defendants knew or should have known that such acts and practices are deceptive or otherwise prohibited by law.

107.    Defendants' practices as set forth in Paragraphs 102, 103, 119, 120, 126 and 127 of this Complaint are false and likely to mislead consumers acting reasonably, and constitute deceptive acts or practices in violation of the FDUTPA.  Consumers within the State of Florida and elsewhere were actually misled by Defendants' misrepresentations.

## FLORIDA'S SOLICITATION OF CONTRIBUTIONS ACT

108.    Florida's Solicitation of Contributions Act applies to charitable organizations and those soliciting on their behalf, and prohibits deception, fraud, and misrepresentation in the solicitation and reporting of contributions.  § 496.402, Fla. Stat. (2018).

109.    Pursuant to Section 496.404(1), Florida Statutes, "charitable organization" means "a person who is or holds herself or himself out to be established for any benevolent, educational, philanthropic, . . .patriotic, social welfare or advocacy, public health, . . .or other eleemosynary purpose, or a person who in any manner employs a charitable appeal as the basis for any solicitation or an appeal that suggests that there is a charitable purpose to any solicitation."  A "person" means "an individual, organization, trust, foundation, group, association, entity, partnership, corporation, or society or any combination thereof." § 496.401(19), Fla. Stat. (2018).

110.    Pursuant to Section 496.404(24), Florida Statutes, "solicitation" is defined as a "request, directly or indirectly, for money, property, financial assistance, or any other thing of value on the plea or representation that such money, property, financial assistance, or other

thing of value or a portion of it will be used for a charitable or sponsor purpose or will

benefit a charitable organization or sponsor" and occurs regardless of whether the person

making the solicitation receives any contribution.

111.    Pursuant to Section 496.404(5), Florida Statutes, "contribution" means "the

promise, pledge, or grant of any money or property, financial assistance, or any other thing of

value in response to a solicitation."

112.    During the relevant period, Defendants engaged in the solicitation of

contributions from donors in Florida and across the United States.

113.    Accordingly, Defendants are subject to the provisions of the Florida's

Solicitation of Contributions Act.

114.    Violation of ". . . any law, statute, rule, regulation, or ordinance which

proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or

practices" will constitute a violation of the FDUTPA.  § 501.203(3)(c), Fla. Stat. (2018).

115.    Section 496.416, Florida Statutes, prescribes that a violation of Sections

496.401-496.424 of Florida's Solicitation of Contributions Act constitutes an unfair or

deceptive act or practice in violation of the FDUTPA which is therefore subject to the

penalties and remedies provided for such violations.

## COUNT VI

### MISREPRESENTATION THAT CONTRIBUTIONS GO TO CHARITY IN VIOLATION OF THE FDUTPA THROUGH VIOLATION OF FLORIDA'S SOLICITATION OF CONTRIBUTIONS ACT
#### (By State of Florida Against All Defendants)

116.    Plaintiff Florida Attorney General adopts, incorporates by reference, and re-

alleges Paragraphs 1 – 71, 97 – 100, and 108 – 115 as if fully set forth herein.

117.     Florida's Solicitation of Contributions Act "protect[s] the public by requiring full public disclosure . . . of the purposes for which such contributions are solicited and the manner in which the contributions are actually used." § 496.402, Fla. Stat. (2018).

118.     It is a violation of Florida's Solicitation of Contributions Act to "[m]isrepresent or mislead anyone by any manner, means, practice, or device whatsoever to believe that the person or organization on whose behalf the solicitation or sale is being conducted is a charitable organization or sponsor, or that any of the proceeds of the solicitation or sale will be used for charitable or sponsor purposes, if that is not the fact." § 496.415(7), Fla. Stat. (2018).

119.     In numerous instances, in connection with soliciting charitable contributions from donors, Defendants have represented, directly or indirectly, expressly or by implication, that donors' cash contributions would go to charity to be used primarily to assist veterans, especially those who are wounded or disabled.

120.     In truth and in fact, in numerous instances donors' contributions have not gone to charity to be used primarily to assist veterans.  Instead, the contributions have gone to a corporation controlled by an individual for his personal pecuniary gain.

121.     At all times material to this Complaint, acting alone or in concert with others, Paulson has formulated, directed, controlled, participated in, or had the authority to control, the acts and practices of Help the Vets, including the acts and practices set forth in this Complaint.

122.    The Defendants willfully engaged in these deceptive acts and practices because the Defendants knew or should have known that such acts and practices are deceptive or otherwise prohibited by law.

123.    Defendants' practices as set forth in Paragraph 119 of this Complaint violate Florida's Solicitation of Contributions Act, and therefore constitute a violation of the FDUTPA.

**COUNT VII**

**MISREPRESENTATION THAT CONTRIBUTIONS WERE FOR SPECIFIED CHARITABLE PURPOSES IN VIOLATION OF THE FDUTPA THROUGH VIOLATION OF FLORIDA'S SOLICITATION OF CONTRIBUTIONS ACT (By State of Florida Against All Defendants)**

124.    Plaintiff Florida Attorney General adopts, incorporates by reference, and re-alleges Paragraphs 1 – 71, 97 – 100, and 108 – 115 as if fully set forth herein.

125.    It is a violation of Florida's Solicitation of Contributions Act to "[f]ail to apply contributions in a manner substantially consistent with the solicitation." § 496.415(16), Fla. Stat. (2018).

126.    In numerous instances in connection with soliciting charitable contributions, Defendants have represented, directly or indirectly, expressly or by implication, that donors' contributions would be used to assist veterans, including, in numerous instances, that donations would be spent helping disabled veterans with grants, providing medical assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or other lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

127. In truth and in fact, little or none of the donors' contributions have been spent assisting veterans, including helping disabled veterans with grants, providing medical assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

128. At all times material to this Complaint, acting alone or in concert with others, Paulson has formulated, directed, controlled, participated in, or had the authority to control, the acts and practices of Help the Vets, including the acts and practices set forth in this Complaint.

129. The Defendants willfully engaged in these deceptive acts and practices because the Defendants knew or should have known that such acts and practices are deceptive or otherwise prohibited by law.

130. Defendants' practices as set forth in Paragraph 126 of this Complaint violate Florida's Solicitation of Contributions Act, and therefore constitute a violation of the FDUTPA.

### VIOLATIONS OF THE CALIFORNIA SUPERVISION OF TRUSTEES AND FUNDRAISERS FOR CHARITABLE PURPOSES ACT (CALIFORNIA SUPERVISION ACT)

131. The California Supervision Act, California Government Code §§ 12580-12599.8, applies to "all charitable corporations, unincorporated associations, trustees, and other legal entities holding property for charitable purposes, commercial fundraisers for charitable purposes, fundraising counsel for charitable purposes, and commercial coventurers." Cal. Gov't Code § 12581. "Charitable corporation" is defined as "any nonprofit corporation organized under the laws of [the State of California] for charitable or

eleemosynary purposes and any similar foreign corporation doing business or holding property in [the State of California] for such purposes." Cal. Gov't Code § 12582.1. Meanwhile, "trustee" is defined as including "any individual, group of individuals, corporation, unincorporated association, or other legal entity holding property in trust pursuant to any charitable trust." Cal. Gov't Code § 12582(a).

132.    The California Supervision Act defines "solicitation" or "soliciting" for charitable purposes as "any request, plea, entreaty, demand, or invitation, or attempt thereof, to give money or property, in connection with which any of the following applies: (a) [a]ny appeal is made for charitable purposes[;] (b) [t]he name of any charity, philanthropic or charitable organization is issued or referred to in any such appeal as an inducement for making any such gift[;] (c) [a]ny statement is made to the effect that the gift or any part thereof will go to or be used for any charitable purpose or organization." Cal. Gov't Code § 12581.2.

133.    The California Supervision Act prohibits charitable organizations and commercial fundraisers for charitable purposes from misrepresenting "the purpose of the charitable organization or the nature or purpose or beneficiary of a solicitation. A misrepresentation may be accomplished by words or conduct or failure to disclose a material fact." Cal. Gov't Code § 12599.6(a).

134.    The California Supervision Act also prohibits "the following acts and practices in the planning, conduct, or execution of any solicitation or charitable sales promotion:" "[o]perating in violation of any of the requirements of [the California Supervision Act] or regulations or orders of the [California] Attorney General;" "[u]sing any

unfair or deceptive acts or practices or engaging in any fraudulent conduct that creates a likelihood of confusion or misunderstanding;" and "[m]isrepresenting or misleading anyone in any manner to believe that the person on whose behalf a solicitation or charitable sales promotion is being conducted is a charitable organization or that the proceeds of the solicitation or charitable sales promotion will be used for charitable purposes when that is not the fact." Cal. Gov't Code § 12599.6(f)(1), (2), and (4).

135.    Defendants are subject to the California Supervision Act.  Defendant Help the Vets has been doing business in California, is registered with the California Attorney General's Registry of Charitable Trusts pursuant to California Government Code § 12585 and related regulations, and was assigned registration number 0192587.  Defendant Paulson is a trustee subject to the California Supervision Act pursuant to California Government Code § 12582, holds or otherwise controls charitable assets on behalf of Defendant Help the Vets, and has signed under penalty of perjury registration applications and annual reports filed with the California Attorney General's Registry of Charitable Trusts on behalf of Defendant Help the Vets.

## COUNT VIII

### MISREPRESENTATION THAT CONTRIBUTIONS GO TO CHARITY
### (by Plaintiff California Office of the Attorney General)

136.    Plaintiff California Office of the Attorney General incorporates by reference Paragraphs 1 – 69 and 131 – 135, above.

137.    In numerous instances, in connection with soliciting charitable contributions from donors, Defendants have represented, directly or indirectly, expressly or by implication,

that donors' cash contributions would go to charity to be used primarily to assist veterans, especially those who are wounded or disabled.

138.    In truth and in fact, in numerous instances, donors' cash contributions have not gone to charity to be used primarily to assist veterans.  Instead, the contributions have gone to a corporation controlled by Paulson for his personal pecuniary gain.

139.    Therefore, Defendants' acts and practices in the planning, conduct, or execution of any solicitation as set forth in Paragraph 137 of this Complaint violate the California Supervision Act, specifically California Government Code § 12599.6(a), (f)(1), (2), and (4).

## COUNT IX

### MISREPRESENTATION THAT CONTRIBUTIONS WERE FOR SPECIFIED CHARITABLE PURPOSES
### (by Plaintiff California Office of the Attorney General)

140.    Plaintiff California Office of the Attorney General incorporates by reference Paragraphs 1 – 69 and 131 – 135, above.

141.    In numerous instances in connection with soliciting charitable contributions, Defendants have represented, directly or indirectly, expressly or by implication, that donors' contributions would be used to assist veterans, including, in numerous instances, that donations would be spent helping disabled veterans with grants, providing medical assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or other lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

142.    In truth and in fact, little or none of the donors' contributions have been spent assisting veterans, including helping disabled veterans with grants, providing medical

assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

143.    Therefore, Defendants' acts and practices in the planning, conduct, or execution of any solicitation as set forth in Paragraph 141 of this Complaint violate the California Supervision Act, specifically California Government Code § 12599.6(a), (f)(1)-(2).

## COUNT X

### MISREPRESENTATION THAT HELP THE VETS WAS "RATED GOLD" BY AN INDEPENDENT CHARITY-RATING ORGANIZATION
#### (by Plaintiff California Office of the Attorney General)

144.    Plaintiff California Office of the Attorney General incorporates by reference Paragraphs 1 – 69 and 131 – 135, above.

145.    In numerous instances, in connection with soliciting charitable contributions, Defendants have represented, directly or indirectly, expressly or by implication, that Help the Vets was "rated gold" for its veterans' programs by an independent charity-rating organization.

146.    In truth and in fact, Help the Vets was not "rated gold" for its veterans' programs by an independent charity-rating organization. The independent organization to which Help the Vets' solicitations have referred, GuideStar, does not evaluate the programs, governance, or effectiveness of any organization.

147.    Therefore, Defendants' acts and practices in the planning, conduct, or execution of any solicitation as set forth in Paragraph 145 of this Complaint violate the California Supervision Act, specifically California Government Code § 12599.6(f)(1)-(2).

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("CALIFORNIA UCL")

148.   The California UCL, California Business and Professions Code §§ 17200-17208, applies to any person who engages, has engaged, or proposes to engage in unfair competition.

149.   The California UCL defines "unfair competition" as including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

150.   The California UCL defines "person" as including "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." Cal. Bus. & Prof. Code § 17201.

151.   The California UCL prohibits any person from engaging in unfair competition. Cal. Bus. & Prof. Code §§ 17203, 17206, 17206.1.

152.   Defendants are subject to the California UCL.

### COUNT XI

### UNFAIR COMPETITION
**(by Plaintiff California Office of the Attorney General)**

153.   Plaintiff California Office of the Attorney General incorporates by reference Paragraphs 1 – 69, 84 – 96, and 131 – 152, above.

154.   Defendants have engaged in acts or practices that constitute unfair competition within the meaning of the California UCL as alleged in Counts IV, VIII, IX, and X, above. Specifically, Defendants have violated the following laws as alleged in Counts IV,

VIII, IX, and X, above: 16 C.F.R. § 310.3(b); California Government Code § 12599.6(a), (f)(1), (2), and (4).

## VIOLATIONS OF THE MARYLAND SOLICITATIONS ACT
### <u>COUNT XII</u>

### FALSE OR MATERIALLY MISLEADING SOLICITATIONS
**(By State of Maryland Against All Defendants)**

155.    Plaintiff State of Maryland adopts, incorporates, and re-alleges Paragraphs 1 - 71 and Paragraphs 84 – 96 as if fully set forth herein.

156.    In numerous instances, in connection with soliciting charitable contributions from donors, Defendants, directly or indirectly, expressly or by implication, have represented that donors' contributions would go to a legitimate charitable organization and be used primarily for charitable purposes benefitting veterans.

157.    In truth and in fact, donors' contributions have not gone to a legitimate charitable organization and were not used primarily for charitable purposes benefitting veterans.

158.    The charitable solicitations made by Help the Vets on its own behalf and through solicitations made by its professional solicitors were false and/or materially misleading.

159.    Therefore, Defendants have violated the Maryland Solicitations Act, which expressly prohibits the use of false or materially misleading advertising or promotional material in connection with a charitable solicitation.  Md. Code Ann., Bus. Reg. § 6-607.

## COUNT XIII

### DECEPTIVE ACTS AND PRACTICES
### (By State of Maryland Against All Defendants)

160.    Plaintiff State of Maryland adopts, incorporates, and re-alleges Paragraphs

1 - 71, 84 – 96, and 155 – 159 as if fully set forth herein.

161.    In numerous instances in connection with soliciting charitable contributions,

Defendants have represented, directly or indirectly, expressly or by implication, that donors'

contributions would be used to assist veterans, including, in numerous instances, that

donations would be spent helping disabled veterans with grants, providing medical assistance

to veterans, operating a suicide prevention program for veterans, providing family retreats or

other lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

162.    In truth and in fact, little or none of the donors' contributions have been spent

assisting veterans, including helping disabled veterans with grants, providing medical

assistance to veterans, operating a suicide prevention program for veterans, providing family

retreats or lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

163.    Therefore, Defendants have violated the Act, which prohibits actions or

omissions intended to mislead the public, as follows: "In connection with a charitable

solicitation, a charitable organization or charitable representative may not commit an act or

engage in a practice that by affirmative representation or by omission is misleading about

anything important to, or likely to affect, another person's decision to make a charitable

contribution." Md. Code Ann., Bus. Reg. § 6-608.

## COUNT XIV

### MISAPPLICATION OF CHARITABLE CONTRIBUTIONS
### (By State of Maryland Against All Defendants)

164.    Plaintiff State of Maryland adopts, incorporates, and re-alleges Paragraphs

1 - 71, 84 – 96, and 155 – 163 as if fully set forth herein.

165.    By applying charitable contributions in a matter substantially inconsistent

with the charitable solicitations, Defendants have violated the Act.  Md. Code Ann., Bus.

Reg. § 6-606.

## VIOLATIONS OF THE MINNESOTA CHARITABLE SOLICITATION ACT
## COUNT XV

### DECEPTIVE SOLICITATION OF DONATIONS
### (By State of Minnesota Against all Defendants)

166.    Plaintiff State of Minnesota adopts, incorporates, and re-alleges Paragraphs

1 - 69 and Paragraphs 84 – 96 as if fully set forth herein.

167.    Minnesota Statutes section 309.55, subdivision 5, states:

> No charitable organization and no person acting on behalf of a charitable
> organization shall use or employ any fraud, false pretense, false promise,
> misrepresentation, misleading statement, misleading name, mark or
> identification, or deceptive practice, method or device, with the intent that
> others should rely thereon in connection with any charitable solicitation,
> including any such actions or omissions designed to confuse or mislead a
> person to believe that such organization is another organization having the
> same or like purposes; or to believe that the funds being solicited are or will
> be used for purposes and programs conducted within or for persons located
> within the state of Minnesota when such is not the case; or to otherwise
> present purposes and uses of the funds which are not as provided within the
> purposes and uses filed upon registration of said organization under this
> chapter, or if no such registration has been filed, then as provided under the
> exemption of said organization from federal and state income taxes as an
> organization formed and operating for charitable purposes as defined herein.

168.   Minnesota Statutes section 309.50, subdivision 10, states in part:

"Solicit" and "solicitation" mean the request directly or indirectly for any contribution, regardless of which party initiates communication, on the plea or representation that such contribution will or may be used for any charitable purpose, and include any of the following methods of securing contributions:

(1) oral or written request;
(2) the distribution, circulation, mailing, posting, or publishing of any handbill, written advertisement, or publication; . . .

169.   Help the Vets, a registered charitable organization with the Minnesota

Attorney General's Office, solicited, through its professional fundraisers, and using

solicitation materials it approved, contributions in Minnesota.

170.   Help the Vets repeatedly violated Minnesota Statutes section 309.55,

subdivision 5, by engaging in deceptive and misleading practices as described in this

Complaint with the intent that others rely thereon in connection with charitable solicitations,

including by making false, deceptive, and/or misleading representations to Minnesota

residents regarding, among other things, that their contributions would be spent helping

disabled veterans with grants, when in fact Help the Vets reported on its Form 990s that it

has never provided any grants or financial assistance directly to individual veterans; that their

contributions would be spent on providing medical assistance to veterans, when in fact Help

the Vets has only ever distributed vouchers valid at a single chiropractic clinic in Winter

Garden, Florida and that it cannot substantiate were used by a single veteran; that their

contributions would help Help the Vets operate a suicide prevention program for veterans,

when in fact Help the Vets' suicide prevention "program" consisted of nothing more than

Paulson answering phone calls on his cell phone; that their contributions would help Help the

Vets provide family retreats or other lodging to veterans, when Help the Vets only distributed

to other veterans organizations hotel vouchers that it received for free, that were impossible or impractical for most veterans to use, and that it cannot substantiate were used by a single veteran; and that their contributions would be used to help Help the Vets provide grants to veterans fighting breast cancer, when in fact Help the Vets has only ever provided grants to another charity run by Paulson, Breast Cancer Outreach Foundation, and to an organization attempting to develop a vaccine for breast cancer.

171.    Paulson is individually liable for violating section 309.55, subdivision 5, based on the unlawful conduct described in this Complaint because he had authority to control and participate in Help the Vets' operations and affairs, had authority to control and acquiesced to the unlawful conduct, and personally participated in the unlawful conduct.

172.    Due to the deceptive and misleading conduct and representations described in this Complaint, Minnesota residents donated to Help the Vets when they otherwise would not have done so, thereby causing them harm and enriching Help the Vets and Paulson.

173.    Help the Vets' and Paulson's conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 309.55, subdivision 5.

## OHIO CHARITABLE ORGANIZATIONS ACT

174.    O.R.C. § 1716.14(A)(1) of the Charitable Organizations Act provides the following acts and practices are hereby prohibited and declared unlawful as applied to the planning, conducting, or executing of any solicitation of contributions for a charitable organization or charitable purpose: "Committing any deceptive act or practice."

175.    O.R.C. § 1716.14(A)(5) of the Charitable Organizations Act provides the following acts and practices are hereby prohibited and declared unlawful as applied to the planning, conducting, or executing of any solicitation of contributions for a charitable organization or charitable purpose: "Misleading any person in any manner in the belief, or making or using any representation to any person that implies, that the organization on whose behalf a solicitation or charitable sales promotion is being conducted is a charitable organization or that the proceeds of the solicitation or charitable sales promotion will be used for a charitable purpose if either of those is not the fact."

176.    Pursuant to § O.R.C. 1716.16, upon a finding that any person has engaged or is engaging in any act or practice in violation of the Charitable Organizations Act, a court may make any necessary order or enter a judgment including, but not limited to, an injunction, restitution, or an award of reasonable attorneys' fees and costs of investigation and litigation, and may award to the state a civil penalty of not more than ten thousand dollars ($10,000) for each violation of the Charitable Organizations Act.  In seeking injunctive relief, the attorney general shall not be required to establish irreparable harm but only shall establish a violation of a provision of this chapter, or a rule adopted under this chapter, or that the requested order promotes the public interest.

177.    At all times relevant to this action, Defendants engaged in "solicitation" as defined in § O.R.C. 1716.01(K).

## COUNT XVI

### MISREPRESENTATIONS THAT CONTRIBUTIONS WERE FOR A CHARITABLE PURPOSE
### (By Ohio Attorney General Against All Defendants)

178.    Plaintiff Ohio Attorney General adopts, incorporates, and re-alleges Paragraphs 1 – 69, 84 – 96, and 174 – 177 as if fully set forth herein.

179.    In numerous instances, in connection with soliciting charitable contributions from donors, Defendants, directly or indirectly, expressly or by implication, have represented that donors' contributions would go to a legitimate charitable organization and be used primarily for charitable purposes benefitting veterans.

180.    In truth and in fact, donors' contributions have not gone to a legitimate charitable organization and were not used primarily for charitable purposes benefitting veterans.

181.    The charitable solicitations made by Help the Vets on its own behalf and through solicitations made by its professional solicitors were false and/or misleading and constituted deceptive practices in violation of O.R.C. § 1716.14(A)(5).

182.    The Ohio Attorney General is entitled to injunctive relief, restitution, attorneys' fees and costs of investigation and litigation, and civil penalties of up to $10,000 for each violation of O.R.C. § 1716.14 against all Defendants jointly and severally.

## COUNT XVII

### COMMITTING ANY DECEPTIVE ACT OR PRACTICE
### (By Ohio Attorney General Against All Defendants)

183.    Plaintiff Ohio Attorney General adopts, incorporates, and re-alleges Paragraphs 1 – 69, 84 – 96, and 174 – 182 as if fully set forth herein.

184.    In numerous instances, in connection with soliciting charitable contributions from donors, Defendants, directly or indirectly, expressly or by implication, have represented that donors' contributions would go to a legitimate charitable organization and be used primarily for charitable programs benefitting veterans.

185.    In truth and in fact, donors' contributions have not gone to a legitimate charitable organization and were not used primarily for charitable purposes benefitting veterans.

186.    The charitable solicitations made by Help the Vets on its own behalf and through solicitations made by its professional solicitors were false and/or misleading and constituted deceptive practices in violation of O.R.C. § 1716.14(A)(1)-(2).

187.    The Ohio Attorney General is entitled to injunctive relief, restitution, attorneys' fees and costs of investigation and litigation, and civil penalties of up to $10,000 for each violation of O.R.C. § 1716.14 against all Defendants jointly and severally.

## THE OREGON CHARITABLE SOLICITATIONS ACT AND THE OREGON UNLAWFUL TRADE PRACTICES ACT

188.    The Oregon Charitable Solicitations Act states in relevant part that "[n]o person shall make any false or misleading representations in the course of any solicitation of contributions." Under the Oregon Charitable Solicitations Act, "a representation" includes both an assertion, whether made by words or conduct, as well as "a failure to disclose a fact." *See* ORS 128.886.

189.    The Oregon Unlawful Trade Practices Act states that "[a]person engages in an unlawful practice if in the course of the person's business, vocation or occupation the

person" violates the provisions of the Oregon Charitable Solicitations Act. *See* ORS 646.608(1)(dd).

190.    Plaintiff State of Oregon is entitled to injunctive relief, restitution, attorneys' fees and costs of investigation and litigation, and civil penalties of up to $25,000 for each violation of ORS 128.886 and ORS 646.608(1)(dd) against all Defendants jointly and severally. *See* ORS 646.642, ORS 646.632, and ORS 646.636.

## COUNT XVIII

### VIOLATION OF THE OREGON CHARITABLE SOLICITATIONS ACT AND THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (By State of Oregon Against All Defendants)

191.    Plaintiff State of Oregon adopts, incorporates, and re-alleges Paragraphs 1 - 69 and 188 - 190 as if fully set forth herein.

192.    In numerous instances, in connection with soliciting charitable contributions from donors, Defendants, directly or indirectly, expressly or by implication, have represented that donors' contributions would go to a legitimate charitable organization and be used primarily for charitable purposes benefitting veterans.

193.    In truth and in fact, donors' contributions have not gone to a legitimate charitable organization and were not used primarily for charitable purposes benefitting veterans.

194.    The charitable solicitations made by Help the Vets on its own behalf and through solicitations made by its professional solicitors were false and/or misleading and thus constitute unlawful business practices in violation of ORS 128.886 and ORS 646.608(1)(dd).

## COUNT XIX

## VIOLATION OF THE OREGON CHARITABLE SOLICITATIONS ACT AND THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (By State of Oregon Against All Defendants)

195.    Plaintiff State of Oregon adopts, incorporates, and re-alleges Paragraphs 1 -69 and 188 – 194 as if fully set forth herein.

196.    In numerous instances in connection with soliciting charitable contributions, Defendants have represented, directly or indirectly, expressly or by implication, that donors' contributions would be used to assist veterans, including, in numerous instances, that donations would be spent helping disabled veterans with grants, providing medical assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or other lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

197.    In truth and in fact, little or none of the donors' contributions have been spent assisting veterans, including helping disabled veterans with grants, providing medical assistance to veterans, operating a suicide prevention program for veterans, providing family retreats or lodging to veterans, or providing grants to U.S. veterans fighting breast cancer.

198.    The charitable solicitations made by Help the Vets on its own behalf and through solicitations made by its professional solicitors were false and/or misleading and thus constitute unlawful business practices in violation of ORS 128.886 and ORS 646.608(1)(dd).

## CONSUMER INJURY

199.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, the FDUTPA, Florida's Solicitation of Contributions Act, the Florida Not For Profit Corporation Act, the Florida

Trust Code, the California Supervision Act, the California UCL, the Maryland Solicitations Act, the Minnesota Charitable Solicitation Act, Ohio's Charitable Organizations Act, and Oregon's Charitable Solicitations Act and Unlawful Trade Practices Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

200.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

201.    Sections 4(a) and 6(b) of the Telemarketing Act, 15 U.S.C. §§ 6103(a) and 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

202.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow the Attorneys General of the States of Florida, California, Maryland, Minnesota, Ohio, and Oregon to enforce their state law claims against Defendants in this Court and to grant such relief as provided under state law.

203.    Pursuant to Sections 501.207, 501.2075, and 501.2077 of the FDUTPA;

Sections 617.2003, 617.1420, and 617.1430 of the Florida Not For Profit Corporation Act;

and Chapter 736 of the Florida Trust Code; and this Court's own equitable powers; this Court

may award injunctive and such other monetary and equitable relief necessary to redress

injury to consumers and governmental entities resulting from Defendants' violation of the

FDUTPA, Florida's Solicitation of Contributions Act, the Florida Not For Profit Corporation

Act, and the Florida Trust Code, including, but not limited to, ordering a Defendant to:

dissolve or reorganize; carry out a transaction in accordance with the reasonable expectations

of consumers or governmental entities; make contributions; provide restitution; reimburse

consumers or governmental entities found to have been damaged; and strike or limit the

application of clauses of contracts to avoid an unconscionable result.  Additionally, pursuant

to these provisions, this Court is also empowered to order any defendant to divest herself or

himself of any interest in any enterprise, including real estate; impose reasonable restrictions

upon the future activities of any defendant to impede her or him from engaging in or

establishing the same type of endeavor; to grant legal, equitable, or other appropriate relief;

and pay civil penalties.

204.    Pursuant to California Government Code §§ 12591.1(a), (c), (f) and 12598(b)-

(c) of the California Supervision Act, this Court is empowered to grant injunctive relief to

restrain violations of the California Supervision Act, and to grant restitution, civil penalties,

attorneys' fees and costs, and other relief as the Court may deem appropriate to ensure the

due application of charitable funds.

205. Pursuant to California Business and Professions Code §§ 17203, 17206, and 17206.1 of the California UCL, this Court is authorized to enjoin any person who engages, has engaged, or proposes to engage in unfair competition, and to grant civil penalties, and other relief as may be necessary to restore to any person in interest any money or property which may have been acquired by means of such unfair competition.

206. Pursuant to Md. Code Ann., Bus. Reg., § 6.5-102(a), the Maryland Attorney General represents the public interest and is authorized to prevent, remedy, or obtain damages for the misapplication, diversion, or waste of a charitable asset or a breach of fiduciary or other legal duty in the governance management, or administration of a charitable asset. In addition, the Attorney General has authority to file a lawsuit to enjoin violations of the Maryland Solicitations Act as set forth in Md. Code Ann., Bus. Reg., § 6-205(f). The aforementioned authority permits the Attorney General to seek a restraining order for appropriate relief, including provisions that enjoin further violations of the Maryland Solicitations Act; stop Defendants from making further charitable solicitations in the State of Maryland; and that secures payment of the charitable contributions received by the solicitor to charitable purposes or beneficiaries consistent with the purposes represented or beneficiaries named in the charitable solicitations which generated the contributions. Md. Code Ann., Bus. Reg., § 6-205(f)(1)-(6).

207. Pursuant to Minnesota Statutes chapter 8, Minnesota Statutes sections 309.50-.61, and common law authority, including *parens patriae* authority, the Minnesota Attorney General is authorized to seek and the Court is authorized to award injunctive relief, restitution, other equitable relief, civil penalties of up to $25,000 per violation, the

appointment of a receiver, suspension of a charitable registration, attorneys' fees, and costs and expenses of investigations and litigation to remedy the deceptive and unlawful conduct described in this Complaint.

208.    Ohio Revised Code (O.R.C.) § 109.23, et seq. ("Ohio Charitable Trust Act"), O.R.C. Chapter 1716 ("Ohio Organizations Act"), and the Attorney General's common law authority to enforce charitable trusts permits the Attorney General to seek injunctive relief, rescission or reformation of trusts, restitution, and other equitable relief to prevent the waste, dissipation, and loss of charitable assets, and/or to stop ongoing donor deception caused by Defendants' violations of state law. These state laws and common law authority also authorize the Attorney General to obtain civil penalties, attorneys' fees, expenses, and costs.

209.    The Oregon Charitable Trust and Corporation Act, the Oregon Charitable Solicitations Act, the Oregon Unlawful Trade Practices Act, and the Oregon Attorney General's common law authority to enforce charitable trusts permit the Oregon Attorney General to seek injunctive relief, rescission or reformation of trusts, restitution, and other equitable relief to prevent the waste, dissipation, and loss of charitable assets, and/or to stop donor deception caused by Defendants' ongoing or impending violations of state law. These state laws and common law authority also authorize the Oregon Attorney General to obtain civil penalties, attorneys' fees, expenses, and costs.

## PRAYER FOR RELIEF BY THE FEDERAL TRADE COMMISSION

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), the TSR, 16 C.F.R. Part 310, and the Court's own equitable powers, requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

B.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

### PRAYER FOR RELIEF BY THE FLORIDA ATTORNEY GENERAL

Wherefore, Plaintiff Florida Attorney General, pursuant to Sections 501.207, 501.2075, 501.2077; 617.2003, 617.1420, 617.1430; and Chapter 736, Florida Statutes; 15 U.S.C. § 6103(a); and this Court's own equitable powers, requests that this Court award such relief as the Court finds necessary to redress injury to consumers and government entities resulting from Defendants' violations of the FDUTPA, the TSR, and Florida's Solicitation of Contributions Act, including, but not limited to, the following:

A.      Enter judgment in favor of the Florida Attorney General and against Defendants for Counts IV, V, VI, and VII alleged in this Complaint;

B.      Order the dissolution of Help the Vets, Inc.;

C.      Enter a permanent injunction to prevent future violations of the FDUTPA, the TSR, and Florida's Solicitation of Contributions Act by Defendants;

D.      Permanently enjoin the Defendants from engaging in any charitable activities for financial gain or monetary benefit;

E.      Require Defendants to carry out transactions in accordance with the reasonable expectations of consumers or governmental entities;

F.      Require Defendants to make charitable contributions;

G.      Award reimbursement to consumers or government entities found to have been damaged in the form of restitution or disgorgement of ill-gotten gains against the Defendants jointly and severally;

H.      Assess civil penalties to be paid jointly and severally in an amount up to $10,000 per transaction pursuant to Section 501.2075, Florida Statutes, and up to $15,000 per transaction pursuant to Section 501.2077, Florida Statutes, for the willful acts and practices of the Defendants in violation of the FDUTPA;

I.      Award the Florida Attorney General the attorneys' fees and costs of bringing this action;

J.      Award the Florida Attorney General such equitable or other relief as is just and appropriate pursuant to the FDUTPA, Florida's Solicitation of Contributions Act, the Florida Not For Profit Corporation Act, the Florida Trust Code, or the TSR; and,

K.      Award the Florida Attorney General such other and additional relief as this Court may determine to be just and proper.

## PRAYER FOR RELIEF BY THE CALIFORNIA OFFICE OF THE ATTORNEY GENERAL

Wherefore, Plaintiff California Office of the Attorney General, pursuant to 15 U.S.C. § 6103(a), California Government Code §§ 12591.1(a), (c), (f) and 12598(b)-(c) of the California Supervision Act, California Business and Professions Code §§ 17203, 17206, and

17206.1 of the California UCL, and the Court's own equitable powers, requests that the Court:

A.      Enter a judgment in favor of Plaintiff California Office of the Attorney General and against Defendants for Counts IV, VIII-XI alleged in this Complaint;

B.      Enter a permanent injunction to enjoin and prevent future violations of the TSR, California Supervision Act, and California UCL by Defendants;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, California Supervision Act, and California UCL, including but not limited to, restitution and restoration of money or property;

D.      Award Plaintiff California Office of the Attorney General civil penalties to be paid jointly and severally in an amount up to $10,000 for each act or omission that constitutes a violation of the California Supervision Act, $2,500 for each violation of the California UCL, and $2,500 for each violation of the California UCL perpetrated against one or more senior citizens or disabled persons;

E.      Award Plaintiff California Office of the Attorney General attorneys' fees and costs of bringing this action; and

F.      Award Plaintiff California Office of the Attorney General such other and additional relief as the Court may determine to be just and proper.

## PRAYER FOR RELIEF BY THE STATE OF MARYLAND

Wherefore, Plaintiff State of Maryland, pursuant to 15 U.S.C. § 6103(a); Md. Code Ann., Bus. Reg., § 6.5-102(a); the Maryland Solicitations Act, Md. Code Ann., Bus. Reg. § 6-205(f); and this Court's equitable powers, requests that this Court award such relief as the

Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR and the Maryland Solicitations Act, including, but not limited to the following:

A.  Enter judgment in favor of the State of Maryland and against Defendants for Counts IV, XII, XIII, and XIV alleged in this Complaint;

B.  Order the dissolution of Help the Vets, Inc.;

C.  Permanently enjoin Defendants from violating the TSR and the Maryland Solicitations Act in the future;

D.  Permanently enjoin the Defendants from further charitable solicitations in the State of Maryland using any means whatsoever;

E.  Permanently enjoin the Defendants from serving as an officer, director, employee, trustee, professional solicitor, fundraising counsel, or in any other capacity for a nonprofit organization in the State of Maryland for which such individuals would be directly responsible for charitable solicitations;

F.  Assess civil penalties to be paid jointly and severally in the amount of $5,000 for each willful violation or in the alternative $3,000 for each grossly negligent violation; and

G.  Award the State of Maryland the costs of bringing this action, attorneys' fees, and any other appropriate relief that this Court may determine to be just and proper.

## PRAYER FOR RELIEF BY STATE OF MINNESOTA

Wherefore, Plaintiff State of Minnesota, by its Attorney General, Lori Swanson, respectfully asks this Court to award, pursuant to 15 U.S.C. § 6103(a), the Minnesota Charitable Solicitation Act, Minn. Stat. §§ 309.50-.61, and this Court's own equitable powers, the following relief:

A.      Enter judgment in favor of the State of Minnesota, by its Attorney General, Lori Swanson, and against Defendants for Counts IV and XV alleged in this Complaint;

B.      Declaring that Defendants' acts and omissions as described in this Complaint constitute multiple, separate violations of the TSR and Minnesota Statutes section 309.55;

C.      Permanently enjoining Defendants and their employees, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from engaging in the unlawful acts described in this Complaint, or in any other way violating the TSR and the Minnesota Charitable Solicitation Act, Minnesota Statutes sections 309.50-.61;

D.      Permanently enjoining Defendants from engaging in further activities or operations in Minnesota or with respect to a Minnesota resident related to the solicitation, acceptance, processing, or handling of charitable contributions, or from consulting for or otherwise assisting any other person or entity involved in such activities or operations, or from overseeing, managing, directing, or otherwise exercising any control over any charity, professional fundraiser, or other entity involved in such activities or operations;

E.      Requiring Defendants and their employees, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, to undertake remedial actions to address the unlawful acts described in this Complaint;

F.      Awarding monetary relief, including restitution, pursuant to Minnesota Statutes sections 8.31, 309.57, Minnesota common law, the *parens patriae* doctrine, and the

general equitable powers of this Court, as necessary to remedy the harm and injury from Defendants' acts described in this Complaint;

G.      Awarding civil penalties pursuant to Minnesota Statutes sections 8.31 and 309.57;

H.      Awarding the Minnesota Attorney General the attorneys' fees, litigation costs, and costs of investigation as authorized by Minnesota Statutes sections 8.31 and 309.57; and

I.      Granting such further relief as provided for by law or equity, or as the Court deems appropriate and just.

## PRAYER FOR RELIEF BY THE OHIO ATTORNEY GENERAL

Wherefore, Plaintiff Ohio Attorney General, pursuant to 15 U.S.C. § 6103(a), O.R.C. Sections 1716.14 and 1716.16, and this Court's own equitable powers, respectfully requests that the Court award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR and the Ohio Charitable Organizations Act, including, but not limited to the following:

A.      Enter judgment in favor of the Ohio Attorney General against Defendants for Counts IV, XVI, and XVII alleged in this Complaint;

B.      Order the dissolution of Help the Vets, Inc.;

C.      Enter a permanent injunction to prevent Defendants from future violations of the TSR and the Ohio Charitable Organizations Act, including a permanent injunction prohibiting Defendants from soliciting in the State of Ohio for charitable purposes;

D.     Grant a permanent injunction that perpetually enjoins Defendants from incorporating or holding any position as an officer, trustee, or employee of any nonprofit corporation or association in the State of Ohio;

E.     Order Defendants to pay restitution and compensatory damages, including interest for all amounts unjustly or illegally retained by them, to the Ohio Attorney General for distribution to other charitable organizations;

F.     Award civil penalties of $10,000 for each violation of the Ohio Charitable Organizations Act;

G.     Declare the terms of the charitable trust and enter an order enforcing those terms in a manner consistent with this Complaint including distributing all assets and proceeds to other charitable organizations;

H.     Reform the charitable trust in accordance with the doctrine of *cy pres* or deviation;

I.     Award such relief as the Court finds necessary to redress injury to donors resulting from Defendants' violations of the TSR and the Ohio Charitable Organizations Act and common law;

J.     Award Plaintiff the costs of bringing this action, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper.

## PRAYER FOR RELIEF BY THE STATE OF OREGON

Wherefore, Plaintiff State of Oregon, pursuant to 15 U.S.C. § 6103(a), ORS 646.636, and ORS 646.642, and this Court's equitable powers, requests that this Court award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants'

violations of the Oregon Charitable Solicitations Act, the Oregon Unlawful Trade Practices Act, and the TSR, including, but not limited to the following:

    A.      Enter judgment in favor of the State of Oregon and against Defendants for Counts IV, XVIII, and XIX alleged in this Complaint;

    B.      Order the dissolution of Help the Vets, Inc.;

    C.      Permanently enjoin Defendants from violating the Oregon Charitable Solicitations Act and the Oregon Unlawful Trade Practices Act by in the future;

    D.      Permanently enjoin the Defendants from soliciting charitable donations in the State of Oregon;

    E.      Award restitution and disgorgement, pursuant to ORS 646.636, to Oregon consumers found to have been damaged in the form of restitution or disgorgement of ill-gotten gains against the Defendants jointly and severally;

    F.      Assess civil penalties to be paid jointly and severally in an amount up to $25,000 per willful violation of the Oregon Unlawful Trade Practices Act and Charitable Solicitations Act pursuant to ORS 646.642;

    G.      Award the State of Oregon the attorneys' fees and costs of bringing this action pursuant to ORS 646.632; and

    H.      Award the State of Oregon such other and additional relief under ORS 646.642 and the common law as this Court may determine to be just and proper.

Respectfully submitted,

**FOR PLAINTIFF FEDERAL TRADE COMMISSION:**

ALDEN F. ABBOTT
General Counsel

THOMAS N. DAHDOUH
Regional Director, Western Region

CHARLES A. HARWOOD
Regional Director, Northwest Region

*Laura Fremont*

LAURA FREMONT CA Bar #159670
Trial Counsel
TRACY S. THORLEIFSON, WA Bar # 16623
Federal Trade Commission
901 Market Street, Ste. 570
San Francisco, CA 94103
lfremont@ftc.gov
tthorleifson@ftc.gov
Phone: (415) 848-5193 (Fremont),
 (206) 220-4481 (Thorleifson)
Fax: (206) 220-6366

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

Date: ___7/16/18___

**FOR PLAINTIFF THE FLORIDA ATTORNEY GENERAL**

JENNIFER H. KNUTTON, FL Bar # 92771
Trial Counsel
ELLEN ANNALIESE BULLOCK, FL Bar # 102980
DONNA C. VALIN, FL Bar # 96687
Assistant Attorneys General
Office of the Attorney General
Consumer Protection Division
135 W. Central Blvd., Suite 670
Orlando, FL 32801
Jennifer.Knutton@myfloridalegal.com
Ellen.Bullock@myfloridalegal.com
Donna.Valin@myfloridalegal.com
Phone: (407) 316-4840
Fax: (407) 245-0365

Attorneys for Plaintiff
OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA
DEPARTMENT OF LEGAL AFFAIRS

Date: __7/17/18__

**FOR PLAINTIFF CALIFORNIA OFFICE OF THE ATTORNEY GENERAL**

XAVIER BECERRA
Attorney General of California

By: _____
BRIAN ARMSTRONG
Deputy Attorney General
CA Bar # 203534*
California Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3758
Facsimile: (415) 703-5480
Brian.Armstrong@doj.ca.gov
* Application for *pro hac vice* pending
Attorney for Plaintiff California Office of the Attorney General

Date: July 11, 2018

**FOR PLAINTIFF STATE OF MARYLAND**

BRIAN E. FROSH
Attorney General of Maryland

*Josaphine B. Yuzuik*

JOSAPHINE B. YUZUIK
Assistant Attorney General
Office of the Attorney General
Office of the Secretary of State
Fred L. Wineland Building
16 Francis Street, Room 209
Annapolis, Maryland 21401
410-260-3855
410-974-5527 (facsimile)
Josaphine.Yuzuik@maryland.gov
* Application for *pro hac vice* pending
Attorney for Plaintiff State of Maryland

Date: *July 16, 2018*

**FOR PLAINTIFF STATE OF MINNESOTA**

LORI SWANSON
Attorney General
State of Minnesota


SARAH GILLASPEY (#0392202)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Telephone: (651) 757-1210
Fax: (651) 296-7438
*sarah.gillaspey@ag.state.mn.us*
*Application for *pro hac vice* pending
Attorney for Plaintiff State of Minnesota

Date: July 16, 2018

**FOR PLAINTIFF OHIO ATTORNEY GENERAL**

MIKE DEWINE
Attorney General

By: _____
ABIGAIL A. K. JACOBS, OH Bar #0088091
Associate Assistant Attorney General
Ohio Attorney General's Office
Charitable Law Section
150 East Gay Street, 23rd Floor
Columbus, Ohio 43215-3130
Telephone: (614) 466-3181
Facsimile:  (614) 466-7988
Abigail.Jacobs@OhioAttorneyGeneral.gov
* Application for *pro hac vice* pending
Attorney for Plaintiff Ohio Attorney General

Date: _____

**FOR PLAINTIFF STATE OF OREGON**

ELLEN F. ROSENBLUM
Attorney General

By: _____
MARK A. KLEYNA, OSB No. 145004
Assistant Attorney General
Charitable Activities Section
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
mark.a.kleyna@doj.state.or.us
Telephone: (971) 671-1880
Facsimile: (971) 673-1882
* Application for *pro hac vice* pending
Attorney for Plaintiff State of Oregon

Date: 7/16/2018